# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: August 31, 2020
Not For Publication

* * * * * * * * * * * * * *
| | | |
|---|---|---|
| RUTH NORTEY, | * | No. 17-1527V |
| | * | |
| Petitioner, | * | Special Master Sanders |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | Influenza ("Flu") Vaccine; SIRVA; |
| AND HUMAN SERVICES, | * | Ruling on the Record; Fact Ruling |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * *

*Timothy P. Clancy,* Clancy & Thompson, PLLC, Tulsa, OK, for Petitioner;
*Heather L. Pearlman,* U.S. Department of Justice, Washington, DC, for Respondent.

## FACT RULING[1]

On October 13, 2017, Ruth Nortey ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program.[2] Petitioner alleged that she developed a shoulder injury related to vaccine administration ("SIRVA") as a result of a trivalent influenza ("flu") vaccine she received on October 14, 2014. Pet. at 1, ECF No. 1. At this time, I find it is necessary to make a factual determination as to the site of Petitioner's vaccine administration and date of onset. After carefully analyzing the information in the record, I find that Petitioner's October 14, 2014 flu vaccine was more likely than not administered in Petitioner's left arm and that she experienced an onset of right shoulder pain relevant to this claim no earlier than February of 2016.

---

[1] This fact ruling shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted fact ruling. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

I. **Procedural History**

On October 13, 2017, Petitioner filed her Petition along with fourteen exhibits consisting of Petitioner's affidavit, medical records, affidavit of counsel, and a medical expense summary. Pet. at 1; Pet'r's Exs. 1–14, ECF Nos. 1-1–1-14. Eleven days later, Petitioner filed two more exhibits including another affidavit from Petitioner and an immunization record. Pet'r's Exs. 15–16, ECF Nos. 8-1–8-2.

Petitioner filed her first motion to issue a subpoena for medical records on November 1, 2017, which was granted. ECF Nos. 11, 14. On the same day, she filed an additional exhibit consisting of medical records. Pet'r's Ex. 17, ECF No. 12-1. Petitioner filed four additional medical records exhibits and a witness list on February 22, 2018. Pet'r's Exs. 19–22, ECF Nos. 22-1–22-4; ECF No. 23.

Petitioner filed additional medical records on March 8, 2018. Pet'r's Ex. 23, ECF No. 27–1. A month later, on April 9, 2018, Petitioner filed a second motion for discovery to issue five subpoenas. ECF No. 33. A month later, Respondent filed a response to Petitioner's motion. ECF No. 34. On May 18, 2018, I ruled on the motion and issued a subpoena to be served by Petitioner. ECF Nos. 35–37 (notice of service filed on July 17, 2018).

Respondent filed his Rule 4(c) report on October 5, 2018. Resp't's Rule 4(c) report, ECF No. 45. In his report, Respondent argued that this case should be dismissed because Petitioner has not shown by a preponderance of the evidence that she received the flu vaccination in her right shoulder, nor that she suffered an injury within forty-eight hours of the injection. *Id.* at 10–11.

On November 12, 2018, Petitioner filed a motion to subpoena Ashley A. Hildebrand, M.D., to appear for a deposition, which I granted the next day. ECF Nos. 47–48. After Dr. Hildebrand's deposition, Petitioner informed the Court in a status report that she "has no additional evidence to submit in support of her claim for benefits." ECF No. 54.

As discovery progressed, fact questions developed over whether Petitioner received the vaccine in her right or left shoulder and when her shoulder pain began, as the medical records did not support Petitioner's factual contentions. *See* ECF No. 57 at 1; ECF No. 58 at 1; Pet'r's Ex. 1 at 1; Pet'r's Ex. 20 at 81. The parties proposed filing joint motions for a ruling on the record so that I could make a fact ruling on these issues. On October 7, 2019, Petitioner filed a motion for ruling on the record, and Respondent filed his respective motion the next day. ECF Nos. 57–58. The parties asked the Court to determine: (1) in which arm Petitioner received her October 14, 2014 flu vaccine; and (2) the onset date for Petitioner's right shoulder symptoms. *Id.*

II. **Summary of the Relevant Evidence**

a. **Medical Records**

Petitioner received the flu vaccine at issue on October 14, 2014, as a condition of her employment as a medical assistant. Pet'r's Ex. 16. The vaccination consent form indicates that she received the vaccine in her left deltoid. Pet'r's Ex. 20 at 81. At the time of vaccination,

Petitioner was forty-eight years old, and her prior medical history was significant for degenerative cervical disc disease with mild canal stenosis, migraines, chronic neck and back pain, fatigue, and depression. *See* Pet'r's Ex. 5 at 1; Pet'r's Ex. 19 at 91, 112.

On October 23, 2014, Petitioner presented to her primary care physician ("PCP") and employer, Dr. Hildebrand, with complaints of headaches, nausea, and dysuria.[3] Pet'r's Ex. 19 at 83. On December 1, 2014, Petitioner presented to the St. John Clinic for back and neck pain on her right side, due to a work-related accident where she tried to catch a falling machine. *Id.* at 81; Pet'r's Ex. 5 at 3–4; Pet'r's Ex. 20 at 79–80. This injury was reported to her employer for a workers' compensation evaluation. Pet'r's Ex. 20 at 73-74. From December 5, 2014 to May 1, 2015, Petitioner had ten combined visits to the St. John Clinic and St. John Occupational Health where she related her then-current injuries back to the December 1, 2014 accident. *See* Pet'r's Ex. 5 at 3–23; Pet'r's Ex. 19 at 68–82; Pet'r's Ex. 20 at 29, 37, 45, 62–71. The medical records from these visits state that Petitioner "[had] a lot of pain in her neck and shoulders." *See*, *e.g.*, Pet'r's Ex. 5 at 11. Petitioner was prescribed Prednisone to combat her right-sided pain. Pet'r's Ex. 3 at 6.

Petitioner presented to Sheri Burson, an Advanced Practice Registered Nurse ("APRN"), on April 22, 2015, and complained of back pain, neck pain, and numbness and tingling in her fingers. Pet'r's Ex. 20 at 37–60. She again attributed these symptoms to her December 1, 2014 injury. *Id.* at 37. APRN Burson diagnosed Petitioner with cervical radiculopathy and ordered an MRI, *id.* at 38, which confirmed this diagnosis, *id.* at 30. On May 11, 2015, Petitioner presented to orthopedist, Thomas Craven, M.D., for further consultation regarding her cervical radiculopathy and the associated pain, numbness, and tingling in her right arm. *Id.* at 24–26. During the physical examination, Dr. Craven noted that Petitioner had a "[p]ainless range of motion of [her] bilateral shoulder" and "[n]o weakness of right or left arm." *Id.* at 25. Dr. Craven associated her symptoms with her December 1, 2014 injury. *Id.* at 24, 26. Petitioner was diagnosed with a cervical strain that had existed for five months with "symptoms that [had] gradually resolved on [their] own." *Id.* at 26. Dr. Craven released Petitioner from his care the same day and wrote that "[Petitioner was] at maximum medical improvement today[, and] [s]he does not need any continuing maintenance." *Id.* Dr. Craven noted that he felt "that the major and sole cause of [Petitioner's] current symptoms and problems is that on the job injury as she described to me." *Id.*

Petitioner's vaccination records indicate that she received another flu vaccine in her left deltoid on October 1, 2015. *Id.* at 21. On the vaccination consent form for this date, she indicated that she never had a severe reaction to a previous flu vaccination. *Id.* She next presented to Charles Powell, M.D., at the St. John Clinic about six weeks later on November 14, 2015. Pet'r's Ex. 19 at 62. Dr. Powell wrote that "[Petitioner] reports chronic head and neck pain since a fall more than [five] years ago." *Id.* at 62.

On February 6, 2016, Petitioner underwent electrodiagnostic studies of her bilateral upper extremities because of complaints of numbness and tingling. Pet'r's Ex. 8 at 1–2. The results were consistent with bilateral carpal tunnel syndrome ("CTS"). *Id.* at 2. A week later, on February 12, 2016, Petitioner presented to Sarah Killian, M.D., after an incident the day before where she

---

[3] Dysuria is defined as "1. painful urination. 2. any difficulty of urination." *Dorland's Illustrated Medical Dictionary*, 585 (32nd ed. 2012) [hereinafter "*Dorland's*"].

reached and "felt something pop on her right side where the ribs are." *Id.* at 52. Petitioner was diagnosed with acute thoracic back pain. *Id.*

On April 15, 2016, Petitioner presented to Dr. Hildebrand complaining of right shoulder pain that she attributed to the February 11, 2016 injury. Pet'r's Ex. 5 at 38–39; Pet'r's Ex. 19 at 46. Dr. Hildebrand assessed Petitioner with right shoulder pain and referred her to an orthopedist for an evaluation. Pet'r's Ex. 5 at 38–39. On June 4, 2016, Petitioner returned to Dr. Hildebrand for a follow-up. *Id.* at 40–41. During this visit, Petitioner reported to Dr. Hildebrand that she has had pain in her deltoid muscle and shoulder joint that is exacerbated by movement ever since her 2014 flu vaccine. *Id.* at 40. Petitioner was again referred to an orthopedist for a possible rotator cuff injury or acromioclavicular ("AC") impingement. *Id.* at 40–41.

Petitioner presented to orthopedist, Kevin Dukes, M.D., on June 22, 2016, complaining of right shoulder pain that has persisted for over a year. Pet'r's Ex. 6 at 1. She related to Dr. Dukes that the onset of her shoulder pain was because of her 2014 flu vaccination. *Id.* On examination, Petitioner showed "positive impingement signs of Hawkins and Neer," pain, and weakness in her right shoulder. *Id.* at 3. Dr. Dukes treated her with a corticosteroid injection. *Id.*

Petitioner underwent an MRI scan of her right shoulder on September 1, 2016, which showed mild degeneration of the AC joint and superior lateral humeral head. Pet'r's Ex. 9 at 1. On September 28, 2016, she presented to Dr. Dukes for a follow-up and complained of severe, debilitating pain in her right shoulder. Pet'r's Ex. 6 at 5. Dr. Dukes determined that the MRI showed "mild degenerative arthropathy," and he "felt that her MRI demonstrate[d] a partial under the surface tear of her supraspinatus tendon." *Id.* Dr. Dukes diagnosed Petitioner with a right shoulder impingement, an incomplete right rotator cuff tear, and CTS. *Id.* She elected to proceed with surgery. *Id.*

On October 6, 2016, Petitioner received another flu vaccine in her left deltoid. Pet'r's Ex. 20 at 10. Petitioner again indicated that she had not experienced a severe reaction to a previous flu vaccination. *Id.* A month later, she underwent an arthroscopic rotator cuff repair on her right shoulder, subacromial decompression, and release of her AC ligament. Pet'r's Ex. 17 at 1–2. After surgery, Petitioner followed up with Dr. Dukes who prescribed physical therapy ("PT"). Pet'r's Ex. 6 at 7–9; Pet'r's Ex. 7 at 1–4. Petitioner underwent nine sessions of PT. Pet'r's Ex. 6 at 7–9; Pet'r's Ex. 7 at 1–4. On her PT intake forms, she reported that the date of her injury was October 14, 2014, the date of the flu vaccine at issue. Pet'r's Ex. 7 at 3.

On January 25, 2017, Petitioner presented to Dr. Dukes for a post-operation examination. Pet'r's Ex. 23 at 2–6. Petitioner reported that "she [was] doing well [and] without complaint[,]" but her "shoulder [was] still limited in ROM." *Id.* at 2. On February 3, 2017, Petitioner was told that she would need an additional eight weeks of therapy, and she expressed worry about the possibility of losing her job if she took more time off. Pet'r's Ex. 19 at 30. Petitioner reported that "she is not able to dress herself right now due to the ongoing right arm stiffness." *Id.*

Dr. Dukes saw Petitioner again on February 20, 2017. Pet'r's Ex. 23 at 6. Dr. Dukes noted that Petitioner showed "an overall improvement" but reported "difficulty sleeping due to significant pain." *Id.* On March 27, 2017, Petitioner again presented to Dr. Dukes with continued

right shoulder pain and tightness.  *Id.* at 10.  Dr. Dukes administered another steroid injection, which gave her instant relief.  *Id.* at 14.  On May 15, 2017, Petitioner returned to Dr. Dukes after emailing him about a "deep, sharp, needle type pain."  *Id*. at 17.  Dr. Dukes remarked that he was "surprised that [she was] still having some significant pain" in light of her arthroscopic pictures, good ROM, and strength.  *Id*. at 18.  Dr. Dukes ordered an MRI to determine a further course of treatment.  *Id.*

Starting on May 19, 2017, Petitioner began seeing Dustin Radloff, D.C., a chiropractor, for chronic right shoulder pain, which she attributed to the October 2014 vaccination.  Pet'r's Ex. 21 at 1.  Petitioner had five cold laser therapy treatments with Mr. Radloff for her right shoulder pain.  *Id.* at 1-11.

On June 12, 2017, Dr. Dukes noted that Petitioner presented with residual pain in her right shoulder and "occasional electric shock in her elbow."  Pet'r's Ex. 23 at 22.  He wrote that "[Petitioner's] MRI demonstrates what appears to be a well-healed rotator cuff [and] no obvious abnormality."  *Id.* at 23.  On July 5, 2017, Dr. Dukes administered another steroid injection in her right shoulder that was ultrasound guided to "ensure avoidance of an intratendinous injection."  *Id.* at 25–26.  Dr. Dukes wrote that this is a "[c]omplex type shoulder issue that seemed to have stemmed from a flu vaccination of greater than a year ago."  *Id.* at 29.  Petitioner again returned to Dr. Dukes on July 26, 2017 with "significant[,] debilitating right shoulder pain."  *Id.* at 37–38.  Dr. Dukes recommended a repeat surgery for lysis of adhesions and evaluation of a rotator cuff repair.  *Id.* at 38.

On August 1, 2017, Petitioner presented to Christopher Place, M.D., after she tripped on a garden hose and aggravated her right shoulder injuries.  Pet'r's Ex. 19 at 17.  During this visit, she reported that she scheduled an appointment with Dr. Dukes for September 19, 2017 for a second surgery of her shoulder.  *Id.*

Petitioner presented to Richard Hastings, D.O., on September 18, 2017 with complaints of daily pain in her right shoulder that was exacerbated with movement.  Pet'r's Ex. 3 at 9.  D.O. Hastings noted that "[Petitioner] does have a catching, grinding sensation with clicking and popping.  [Petitioner] complains of significant weakness when she attempts to push, pull, or lift that is associated with increasing pain, as well."  *Id.*  During this evaluation, Petitioner related her injuries to the October 14, 2014 flu vaccination.  *Id.* at 4–5.  She reported to D.O. Hastings that, at the time of the vaccination, "the pain was intense enough that she screamed . . ., and a painful lump developed at the injection site."  *Id.*  Petitioner indicated that she first reported the flu vaccination injury the day after the injection and an Employer's First Notice of Injury was submitted.[4]  *Id.* at 5.  D.O. Hastings concluded that "it is his medical opinion based upon a reasonable degree of medical certainty, utilizing the patient's physical and clinical examination, review of the patient's medical records, and review of the peer-reviewed literature, that [Petitioner] had a right shoulder injury resulting from an October 14, 2014 [flu] vaccination . . . ."  Pet'r's Ex. 3 at 16.  The following day, Dr. Dukes performed a second surgery on Petitioner's right shoulder, which included a distal clavicle excision and debridement of scar tissue.  Pet'r's Ex. 11 at 1–2.  Dr. Dukes' findings were "for the most part fairly unimpressive," but he noted that she showed extensive fibrosis.  *Id.*

---

[4] No records of the notice were submitted to the Court.

5

Petitioner presented for a post-operation follow-up with Dr. Dukes on October 2, 2017. Pet'r's Ex. 23 at 48.  Petitioner stated that she had already noticed an improvement and a "big difference in her discomfort."  *Id.* at 50.  On October 27, 2017, Petitioner presented to Dr. Hildebrand with a pain that "radiat[ed] up and down her arm" and "started after her first shoulder surgery."  Pet'r's Ex. 19 at 7.  On November 1, 2017, Petitioner reported to Dr. Dukes that her only complaint was pain in her fourth and fifth fingers.  Pet'r's Ex. 23 at 52.  Dr. Dukes prescribed additional PT.  *Id.* at 53

On November 7, 2017, Petitioner presented to Carol Howard, M.D., with "very bad [u]lnar nerve distribution pain."  Pet'r's Ex. 19 at 3.  She reported that she still had "shoulder pain that [did] not tolerat[e] folding exercises at home."  *Id.*  During a November 15, 2017 visit with St. John Clinic physician, Charles Clayton, Petitioner was diagnosed with ulnar nerve neuropathy.  *Id.* at 1.  On November 22, 2017, Petitioner presented to Dr. Powell with continued neck, upper back, right shoulder and right upper extremity pain.  *Id.* at 1.  Dr. Powell referred her to a neurologist for a consultation.  *Id.*

Petitioner made another visit to the St. John Health System on December 12, 2017.  Pet'r's Ex. 23 at 54.  She reported increased pain, decreased ROM, and decreased strength because of pain in her elbow and hands.  *Id.* at 55.  An EMG was scheduled for the pain in her hands, and a home exercise program was prescribed.  *Id.* at 57.  The EMG was performed on December 26, 2017, but was unremarkable with respect to her shoulder, elbow, or wrist.  *Id.* at 63–64.

On January 5, 2018, Dr. Dukes wrote that Petitioner "demonstrate[d] improvement but lack[ed] strength and active motion into shoulder flexion." *Id.* at 62.  Three days later, Dr. Dukes recorded that "[m]ost of her complaints are sensory issues. She has complaints of numbness extending into her hand and arm. She has difficulty sleeping on her right side." *Id.* at 65.  Dr. Dukes noted that she was cleared for work but restricted because of her recent rotator cuff repair. *Id.* at 66.

As of February 13, 2018, Petitioner reported that her severe pain had returned in her right shoulder, elbow, and wrist. *Id.* at 68.  However, Dr. Dukes wrote that he did not think that additional surgeries would benefit her, and therapy was the better option. *Id.* at 71.  At that visit, Dr. Dukes administered another steroid injection to her right shoulder. *Id.*  Petitioner has not filed any more recent medical records after this date.

### b. Affidavits

Petitioner has filed three affidavits in support of her claim.  Pet'r's Exs. 2, 15, 26.  However, the third affidavit reiterates what was said in the first two; therefore, only the first two affidavits will be discussed herein.  *See* Pet'r's Ex. 26.  Petitioner attests that she had no pre-existing conditions or injuries affecting her right shoulder or arm prior to the administration of the October 14, 2014 flu vaccine.  Pet'r's Ex. 2 at ¶ 5.  She writes that she received a flu vaccination in her right deltoid, and she immediately felt a burning pain in her right upper arm.  Pet'r's Ex. 2 at ¶¶ 4, 6; Pet'r's Ex. 25 at ¶¶ 8–9.  Petitioner states that she reported the pain to Dr. Hildebrand, her PCP

6

and employer, a few days after the vaccination.[5]  Pet'r's Ex. 2 at ¶ 8.  Petitioner further writes that Dr. Hildebrand prescribed her Prednisone after an examination; however, the pain worsened, which restricted her ROM and her ability to effectively work as a medical assistant.  *Id.* at ¶¶ 7–8.  In her second affidavit, she states that Dr. Hildebrand and two other employees expressed a willingness to provide facts to support her claim, but they were prevented from doing so by St. John Health System's Risk Management Department.  Pet'r's Ex. 15 at ¶¶ 6–9.

Additionally, Petitioner claims that the immunization consent form from the 2014 flu vaccination indicating that the vaccine was administered in her left deltoid is incorrect or altered.  Pet'r's Ex. 25 at ¶ 10; *see* Pet'r's Exs. 24–25.  Petitioner further claims to have found an anonymous note under her computer keyboard at work suggesting that the vaccination site on her vaccination record was changed to "cover up."[6]  *Id.*

### c. Dr. Hildebrand's Deposition Testimony

Dr. Hildebrand testified in a deposition on May 31, 2019.  Resp't's Ex. A at 1.  Dr. Hildebrand stated that she had no recollection of Petitioner receiving a flu vaccine in 2014 or of being told of a shoulder injury post-vaccination.  *Id.* at 11, 15–16.  Additionally, Dr. Hildebrand said that she did not have a record of Petitioner reporting right or left shoulder pain between October 2014 and April 15, 2015.  *Id.* at 18.  Dr. Hildebrand stated that she records all medical care in a patient's chart and had no recollection of providing Petitioner with any medical care that was not recorded in her chart.  *Id.* at 14–15.  Further, Dr. Hildebrand testified that she would include complaints of shoulder pain in office visit notes even if that was not the primary reason for the visit, and that she would not write a prescription for a coworker without an exam.  *Id.* at 18–19.  Her April 2015 records however, documented that Petitioner complained of right shoulder pain due to "lift[ing] something months prior and heard a pop, and by her own attributions, stated that's why she was having pain."  *Id.* at 16.

After reviewing Petitioner's vaccination consent form, Dr. Hildebrand testified that she had no reason to believe that the document was inaccurate.  *Id.*  She testified that if a nurse had made a mistake on a medical record, the nurse would follow a procedure called "variance reporting," an electronic reporting system used to report a medical error.  *Id.*

### III. Motion for Ruling on the Record

#### a. Petitioner's Arguments

The majority of support for the assertions made in Petitioner's motion come from her affidavit.  She notes that she "swore, by way of affidavit, [that] the injection in question was into her right shoulder" and the "onset of [her] symptoms is documented in [this statement]."  Pet'r's Br. at 1.  Petitioner states that on "December 1, 2016, months before filing her petition for compensation, [she] complained to her physical therapist that her shoulder problems began on

---

[5] No records of an examination a few days after the October 14, 2014 vaccination were submitted to the Court.
[6] The note appears to be typed and no other evidence as to the author or when the note was written has been submitted to the Court.

October 14, 2014." *Id.* at 2. Further, she argues that "[t]he fact that something was not recorded or was incorrectly recorded as having occurred at a particular time does not preclude the court from finding a claim compensable." *Id.* Petitioner additionally argues that "no particular recorded diagnosis, conclusion, or test result is binding upon the special master. Instead, the court must base its findings upon the record as a whole." *Id.* (citing 42 U.S.C. § 300aa-13(b)).

Petitioner further explains that her "failure to report the immediate onset of the injury to her employer, who happened to be her PCP, is excusable considering her fear of ramifications, including harassment, ridicule, and disparaging treatment by her employer[,]" which "materialized . . . after she returned to work from the shoulder injury…[and] was terminated." *Id.* She notes that she did end up reporting her shoulder injury "[o]nce [she] was referred to a specialist," and "[she] freely explained the cause of her injury and diligently pursued treatment." *Id.* at 2-3.

Therefore, Petitioner argues that the "totality of the record of injury and treatment supports that the onset of symptoms was timely and the vaccine was, according to the most reliable evidence, the affidavit of the Petitioner, administered into Petitioner's [sic] right shoulder resulting in a compensable SIRVA." *Id.* at 3.

### b. Respondent's Arguments

Respondent argues in his brief that "[p]reponderant evidence demonstrates that [P]etitioner's 2014 flu vaccine was administered in the left deltoid as the contemporaneous vaccine administration [record] indicates, and that she did not suffer the onset of shoulder pain in temporal proximity to vaccination." Resp't's Br. at 4. Respondent continues by stating that "this case is not appropriate for compensation" because the "facts are dispositive to [P]etitioner's alleged vaccine injury claim." *Id.* Specifically, Respondent argues that compensation should not be awarded because the "record does not demonstrate that [P]etitioner's symptoms began within a reasonable timeframe after her 2014 flu vaccination to support a SIRVA." *Id.* at 11. This is evident because Petitioner "did not seek medical care until April 15, 2016, approximately [one-and-a-half] years after her 2014 flu vaccination." *Id.* Furthermore, Respondent cites to the incident where Petitioner reported that "she injured [her right shoulder] . . . when she dropped something and heard a pop when she went to pick it up." *Id.* (citing Pet'r's Ex. 5 at 38–39). These records do not mention the 2014 flu vaccination. *Id.*

Finally, Respondent argues that Petitioner's submitted affidavits should be given little weight in deciding this matter because he believes that her testimony is in conflict with the contemporaneous evidence. *Id.* (citing *Robi v. Sec'y of Health & Human Servs.,* 2014 WL 167716 (Fed. Cl. Spec. Mstr. Apr. 4, 2014)). Respondent wrote that "Petitioner's affidavits were created three or more years post-vaccination, and the controlling case law mandates that they deserve little weight compared to the medical records." *Id.* at 12. Thus, Respondent concludes that the affidavits are "insufficient to overcome the presumptively accurate medical records noting that Petitioner received the 2014 flu vaccine in her left arm and was asymptomatic following the vaccine." *Id.*

### IV. Applicable Law

To receive compensation under the Vaccine Act, Petitioner must demonstrate either that: (1) she suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that she suffered an "off-Table injury," one not listed on the Table as a result of her receipt of a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

Although Petitioner alleges SIRVA, she does not allege a Table injury since her claim does not meet the Table criteria. The Vaccine Injury Table considers SIRVA a presumptive injury for the influenza vaccine if the first symptom or manifestation of onset of the illness occurs within forty-eight hours of an intramuscular vaccine administration. *See* 42 C.F.R. § 100.3(a)(XIV). The Qualifications and Aids to Interpretation ("QAI") further specify:

> A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> ii) Pain occurs within the specified time-frame;
> iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10). As stated above, Petitioner does not allege a Table injury in this case; thus, she must prove that her injury was caused-in-fact by a Table vaccine. In order to succeed on a theory of causation-in-fact, Petitioner must show:

> by preponderant evidence that the vaccination brought about [the] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*See Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

As a threshold consideration, the Vaccine Act specifically provides that "[t]he special master or court may not make such a finding [of entitlement] based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa–13(a). In

9

Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). "Medical records that are created contemporaneously with the events they describe are presumed to be accurate." *Robi*, 2014 WL 167716 at *1 (citing *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)). Moreover, medical records are "also presumed to be complete, in the sense that the medical records present all the problems of the patient." *Id.* While a special master must consider these opinions and records, they are not "binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

Judges of the Court of Federal Claims have reaffirmed the finding in *Cucuras* that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. *See*, *e.g.*, *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd sub nom. Rickett v. Sec'y of Health & Human Servs.*, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); *Doe/17 v. Sec'y of Health & Human Servs.*, 84 Fed. Cl. 691, 711 (2008); *Ryman v. Sec'y of Health & Human Servs.*, 65 Fed. Cl. 35, 41-42 (2005); *Snyder v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Petitioner suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Petitioner during his life to date. Finding Petitioner's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), *aff'd*, 117 F.3d 545, 547–48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical

professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony. *Cucuras*, 993 F.2d at 1528. Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993). However, compelling oral testimony may be more persuasive than written records. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992).

### V.  Discussion

#### a.  Vaccination Administration Location

In her motion, Petitioner relies on her affidavit as proof that she received her October 14, 2014 vaccine in her right arm. This assertion is not supported by the vaccination consent form. Additionally, Petitioner went on to receive at least two more vaccinations, one on October 1, 2015, and another on October 6, 2016. Both vaccination records note that the vaccines were administered in Petitioner's left shoulder. Petitioner therefore has an established history of receiving her flu vaccines in her left arm. Despite her assertion that she screamed and developed a lump at the injection site in 2014, there is no documentation in her medical records that she complained of immediate pain surrounding the injection site at any of her subsequent doctor's appointments, nor was there any documentation in the medical records that she suffered from a painful lump. Additionally, Petitioner did not assert that she suffered a previous reaction to the flu vaccine on either of her later vaccine consent forms.

By and large courts rely on contemporaneous medical records, because there is an inherent expectation that patients will be honest and comprehensive with providers to receive effective treatments. While it is a rare occurrence that medical records incorrectly document an event, it does happen. These mistakes can be detected by corrective notes later in the record, test results or clinical findings inconsistent with auto-filled forms, or treaters' recollections of interactions with patients. In this case, we do not have any of these types of evidence to support Petitioner's contention that she was vaccinated on her right side. Petitioner's affidavit, without more, is not enough to establish by a preponderant standard, that she received her October 2014 flu vaccine in her right arm.

11

      **b. Injury Onset**

           **i. Date of Initial Complaint of Injury**

      Petitioner and Respondent have also asked for a determination of the onset of Petitioner's relevant symptoms. Petitioner has asserted that she suffered from an immediate reaction that consisted of pain and the formation of a lump at the injection site. Similar to Petitioner's assertion that she received her vaccine in her right arm, there is nothing in her medical record to support this assertion. Petitioner has disputed the accuracy of her medical records. Her medical record does not mention any swelling or report of pain at the time of injection. Petitioner attested that she complained of pain to Dr. Hildebrand, her employer and PCP, a few days post-vaccination. She further stated that Dr. Hildebrand wrote her a prescription for pain. Her medical record does not document any such assessment or treatment. In fact, Petitioner's medical records do not note any complaint or treatment associated with a vaccine injury until over eighteen months post-vaccination. Dr. Hildebrand's sworn testimony that she does not remember treating Petitioner for a vaccine injury, nor would she prescribe pain killers for Petitioner without documentation of an exam, further undercuts Petitioner's account. I will not assume that a medical provider engaged in, at best, sloppy record keeping, or at worst, potential malpractice without objective evidence. I do not find Petitioner's assertion alone to be persuasive.

      In addition to Dr. Hildebrand, Petitioner saw multiple other providers without identifying a vaccine-related injury or seeking treatment for an extended period of time. Petitioner told APRN, Sheri Burson, more than six months post-vaccination, that she suffered a non-vaccine related accident on December 1, 2014. Dr. Craven, Petitioner's orthopedist, also associated Petitioner's symptoms with her December accident. After receiving another flu shot without complaint of prior injury, Petitioner saw Dr. Powell for pain that was not attributed to either vaccine. A February 11, 2016 accident then caused Petitioner to seek treatment from Dr. Killian. Again, she did not mention any vaccine related injury, despite describing pain that occurred on her right side. Petitioner also received another flu vaccination in 2016, again on her left side. Petitioner had multiple opportunities to disclose her injury to a treatment provider other than her employer but did not do so. There is overwhelming evidence in this case that Petitioner did not attribute any pain in her right shoulder to her 2014 flu vaccination until she had suffered other accidents that could have caused her injury. The amount of time that lapsed between the vaccine at issue and her first complaint of vaccine-related injury in 2016 does not allow for a reasonable link of cause and effect. I find that the evidence supports by a preponderant standard that Petitioner first complained of shoulder pain related to her October 14, 2014 vaccine in June of 2016. She originally attributed that same pain to the February 2016 accident, and I find by a preponderant standard that the onset of her relevant pain was on or about February 11, 2016.

           **ii. Cover-up Allegation**

      To reconcile the medical record and Dr. Hildebrand's testimony with her own account, Petitioner describes a concerted effort by her employer to conceal the injury that she sustained by altering records and preventing health system employees from testifying freely and truthfully. Again, these are serious allegations. I will not assume that individuals participated in nefarious behavior without objective, supporting evidence. The hastily written note provided by Petitioner

is concerning.  However, it cannot be authenticated, nor can the source of the note be determined.  Furthermore, Dr. Hildebrand provided logical, coherent testimony during her deposition.  There was no indication that she was under duress or giving a false statement.  I do not find that Petitioner presented preponderant evidence of a cover up sufficient to establish that her medical records were altered.

### iii.  Petitioner's Symptom Presentation

Lastly, it is difficult to determine the onset of Petitioner's relevant symptoms, because her medical history included several related conditions and ailments that preceded her vaccination.  During the course of her treatment, Petitioner also described several other alternative causes to her right shoulder pain.  This presents the possibility that Petitioner suffered from multiple shoulder injuries in addition to the one that she ultimately alleged was caused by her 2014 flu vaccination.  Petitioner had a long-standing history of back and neck pain.  Furthermore, prior to her vaccination, she sought treatment for various causes, ranging from overall fatigue to degenerate cervical disc disease.  Post-vaccination, Petitioner's own accounts to treatment providers included explanations for her shoulder injuries that made no mention of her vaccination.  There is no reason to doubt the veracity of the multiple accounts provided in support of diagnosis and treatment.  Therefore, I will not.  I find that Petitioner's contemporaneous medical records and her own statements to treaters provide preponderant evidence that the shoulder pain first described in December of 2014 followed a work-related accident that occurred on December 1, 2014.  Further, a later aggravation suffered by Petitioner on February 11, 2016 is likewise documented by her contemporaneous medical records.  Petitioner originally attributed this injury to an occasion where she reached and felt a pop near her ribs on the right side.  This explanation was repeated the following April to a different medical provider.  When Petitioner did eventually complain of a vaccine-caused injury in June of 2016, she had last received treatment for the February 11, 2016 accident.  Whether this injury was the result of the original accident Petitioner described, or her 2014 vaccination, is not to be decided at this time.  Petitioner's June 2016 account of a vaccine-induced injury effectively replaced her previous explanation that the cause of her injury was her February 11, 2016 accident.  Nonetheless, Petitioner's June 4, 2016 account, that the right shoulder pain relevant to this claim occurred before her February 2016 accident, is not sufficient to meet the preponderant standard.

## VI.   Conclusion

Based on the above reasoning, I find that Petitioner's October 14, 2014 flu vaccine was more likely than not administered in Petitioner's left arm.  I also find that the evidence submitted by Petitioner establishes by a preponderant standard that she experienced an onset of right shoulder pain relevant to this claim no earlier than February of 2016.  Petitioner has 21 days from the filing of this ruling to file a status report indicating how she wishes to proceed.

**IT IS SO ORDERED.**

<u>s/Herbrina D. Sanders</u>
Herbrina D. Sanders
Special Master